International Union of Bricklayers v. Banta Tile&Marble May I approach, Your Honor? Yes. My name is Thomas Davies. I'm here on behalf of Banta Tile&Marble, the appellant in this matter. I respectfully request three minutes for rebuttal. The underlying facts of this case are uniquely relevant to the disposition on appeal. Banta was a long-time tile contractor in the Lancaster, Pennsylvania area and was signatory to a contract with Local 5 of the Bricklayers for many years. That contract and the entire bargaining relationship ended April 30, 2006. Also a signatory with Local 1 to the overall association collective bargaining agreement, right? That is an ultimate issue for the Court to decide, Your Honor. Banta in January of 1997 signed two separate agreements with Local 1. And those agreements provided for how to terminate them beyond the period stated in the agreement, right? That's correct. And Banta never did that? Neither Banta nor the association, according to the facts of record, filed any notices to terminate the agreement. So you were still subject to the provisions of the collective bargaining agreement? We would concede under the terms of the Evergreen Clause, as we understand it, those clauses in labor law referred to as Evergreen Clauses, that we would be subject to the terms of the agreement and its arbitration provision. The issue in this case, however, is that the Evergreen Clause that was contained in that agreement is, in our opinion, at least ambiguous. As noted on page 18 of the Local 5 brief, the language reads, in the absence of such notice, the employer and tenant should be bound by the area-wide negotiated contracts with the associated tile contractors of Philadelphian suburbs and extending this agreement for the life of the newly negotiated contract. Hold on a second. In the absence of such notice, you're referring to the 90-day notice? That would be the 90-day contract termination notice from either party. Which you did not give. Correct. So now that I argue that, at a minimum, that language is ambiguous. Why is it ambiguous? Well, the last phrase specifically says, extending this agreement for the life of the newly negotiated contract. And that's the standard Evergreen type of clause, where if you fail to provide notice of contract termination, the agreement that you signed renews itself generally on a year-to-year basis. Did you ask for a copy of the newly negotiated contract? Did Banta ask for a copy of the newly negotiated contract? There's no evidence that Banta ever asked for a copy of that agreement. But if there were a newly negotiated contract, you would be subject to it. We disagree with that premise, Your Honor. We believe that under the terms of the standard Evergreen clause, typical in labor law, that we would be subject to the existing contract. But you don't have the standard clause. You have it preceded by the language, the employer and the union agree to be bound by the area-wide negotiated contracts with the associated tile contractors of Philadelphia and suburbs. So that, I mean, that was inserted. So someone had to specifically say, oh, by the way, we're bound by those contracts. Otherwise that, you know, if it doesn't have meaning, you know, how is that surplusage that was inserted before the standard Evergreen? So are you saying we should read that out somehow? It would be our position, Your Honor, that the second phrase after the and at least makes that clause ambiguous because it refers to extending this agreement. Well, this agreement is extended because no notice was given. So the legal effect wouldn't be that this agreement does continue in any event because no notice was given? That would be the legal effect of a standard Evergreen clause. And again, it's our position that if the union intended to have something other than the Evergreen clause, which was common in the industry and common in labor law, that this language does not make that as clear as it could have. Obviously Then where does ambiguity get you? You say, okay, it's ambiguous. Therefore, because it's ambiguous, what do we look to to find out how we should construe it? That therefore you should construe it in a manner typical with most standard Evergreen clauses, which simply extend the contract that the contractor in this case had signed and was aware of. What basis, what basis do we do that? The principle I can fall upon is the ambiguity is construed against the drafter. Clearly, Banta was not a drafter of this agreement in that it signed these contracts as what are referred to again in construction labor law as Me Too contracts. They were not a party to the association. They were not a member of the association. They simply executed these contracts in January 1997. Well, but this, aren't we talking about the 97 provision? We are talking about the 97 provision. But I've signed a document that contained this. Correct. But I'm just making the point that they did not negotiate this contract. They simply signed a contract that had been negotiated by others. But isn't that the way these association contracts work in the construction business? And if you're not a member of the association but a signatory employer, you don't necessarily want to be involved in the negotiation of the whole contract. And you don't have to sign the collective bargaining agreement. But once you do, aren't you bound by it? Yes, Your Honor. That is, you've precisely explained the way associated association contracts typically work when signed by non-association members. Again, my point with respect to that argument was that Banta was not a negotiator of this agreement. The ambiguity, therefore, should not be construed against it. And we should default to the last phrase of the paragraph. I'm afraid I don't see your ambiguity. You've been discussing it. But you're saying because it's not the standard evergreen clause. But what about this is ambiguous? What language specifically? At a minimum, Your Honor, it would seem that the two would be in that one would say there's a new contract. One would say, no, the current contract is extended. So then, therefore, there would be two contracts in place. And that would not be the norm in construction industry or any labor law negotiations to have two. Was it your obligation to show in light of the ambiguity that there was an intent that as part of the negotiations there were someone inserted this without someone's knowledge? I mean, this is part of an agreement that Banta did sign, correct? There's no question that Banta signed this agreement. Were there negotiations? Do we know anything about how that negotiation proceeded? We know that this was an existing agreement that had already been negotiated by the association that Banta simply signed on to. Well, but they signed it. Yes, but they did not participate in any negotiations relating to the agreement. But they had to, you know, did they have the opportunity? Do we know that this was forced on them? I mean, do we have any knowledge as to, you know, different bargaining positions or anything of that kind? There's nothing in the record regarding. Actually, that was your choice, wasn't it? I mean, you don't want to be negotiated and getting outside help. Typically what happens that would lead to this scenario is a contractor such as Banta that normally works in one area moves into a different area for a job or a couple of jobs. They are asked to sign the local agreement. And in this case, Banta in, again, January 1997 did sign the two association contracts that contained this precise language. Seven years later, the traveling contractor clause is inserted into a new local one association contract. There's no indication the record Banta was ever aware of this clause until the grievance was filed in August 2006, asserting that Banta was in violation of this clause of the local one contract. Well, they could have terminated, could they not? They could have terminated the 97 agreement at some point along the road. They could have. And inquired about what other contracts were being signed that they were going to be bound to and whether they liked them or not. As a practical matter, there had been a change in ownership and they weren't even aware that this contract was in place and had been signed ten years before. But they weren't deprived. I mean, they didn't attempt to find out. When you buy a company, don't you say what collective bargaining agreements, if any, are in place? Can I see copies of them? That would be the prudent thing to do, Your Honor. Again, in the construction industry, for companies that work occasionally in different areas, it is not uncommon for them to have signed contracts that have been long since forgotten. That's what's referred to here as area-wide negotiated contracts, isn't that so? Collective bargaining agreements and so forth. That's certainly what this phrase, that's what the phrase is referring to, Your Honor, yes. Did you not think that you were subject to collective bargaining agreements, yourself and Local 1? Until the grievance was filed, Banta was not aware that this contract was in existence. The current owners and operators of Banta were not aware that it was even there. But given this phrase, would you not have some responsibility to ask for a copy of the area-wide negotiated contracts? If you agree to be bound by the area-wide negotiated contracts, wouldn't you say, may I see a copy of those area-wide negotiated contracts? Certainly, if the owners and operators of Banta were aware of the existence of this clause, the prudent thing to do would be to make sure they saw any subsequent. Or not work in that area. Well, in this case, the Traveling Contractors Clause, you know, doesn't involve work in the Local 1 area. It involves work that they were continuing to perform in the Local 5 area. And just very briefly, I see my time is about up. The McKinstry case from the Ninth Circuit that's relied on extensively by Mr. Johnston in his brief, and inferentially at least by the district court below, talks about enforcing an arbitration decision arising out of the Traveling Contractors Clause. And on page 35 of Mr. Johnston's brief, he cites a portion of that and talks about where the signatories intended it, the non-signing party, to derive benefits from the agreement. Where such intent can be the right to enforce those benefits, then arbitration is proper. It's our position that in the end, Banta was not even aware of the existence of this clause, so Banta could not be said to have intended to confer any benefit upon Local 5 in terms of enforcing this provision. Thank you. May I approach? Yes. If the court please, my name is Charles Johnston. I represent Bricklayers and Adelide Craft Workers Local 5. As the court noted in these MeToo agreements, there's really two components to this clause that's been generally referred to as evergreen. The first phrase is really the MeToo provision, which says that I will agree to be bound by the terms of an area-wide agreement. In doing that, as the courts noted under labor law, when you do that, you are in effect delegating your bargaining rights to the association. They are your agent. You are bound by their actions. The provision has two components to it if no notice has been given, which has been stipulated in the record that Banta failed to give notice. The first phrase of that sentence talks about the substantive terms of what they will be bound by in subsequent agreements. And then it is linked by a conjunctive and, the word and, and the second phrase then deals with, well, how long will they be bound? And it talks about the term of the agreement. Well, it doesn't say that specifically. It says and extending. And you would think that the agreement that is then going to bind Banta would be an agreement that constitutes a negotiated contract with the associated contractors and extends this agreement for the life of the newly negotiated contract. I mean, that language appears to be irrelevant if the first part of the clause agrees to be then, and extending this agreement, then do we have two sets of provisions that are going to bind it going forward? That's what it seems to say. It seems to have some ambiguity. Clearly by having the phrase this agreement in there, it's inartfully drawn. And as opposed to extending the agreement. But it looks like both provisions are to be applicable going forward. The area-wide negotiated contracts and this agreement would be extended for the life of the newly negotiated contract. That interpretation is not a logical interpretation that the parties would extend on a Me Too that those provisions would go forward. The first one clearly states the intention of the parties here. And this one and the subsequent agreement that was bound with the Me Too and Evergreen, that they would be bound by the... It's a Me Too and an Evergreen. Isn't that internally inconsistent? It's just referring to the term, Your Honor. That's all. That they'll be bound by the term. Well, okay. It doesn't say that. Well, for the life. I'm sorry. It says life as opposed to term. With respect to the lack of knowledge. As has been demonstrated in our brief, and if you look at the record, the traveling contractors clause is a national clause of the bricklayers and allied craft workers union. There is significant amount of litigation that took place throughout the country over that particular clause. Also, it was part of the collective bargaining agreement that Banta had been previously party to with Local 5. Now, Mr. Davies indicated to you initially in his argument that it was relevant to look at that in the context of them terminating it. And I submit to you that there's no relevancy to that. But that clause was in the Local 5 agreement. So they had knowledge of the fact that those clauses are there. The traveling contractors clauses are a relatively common place in the building and construction industry agreements. You'll see from the brief here, they're virtually universal in sheet metal. The painters and allied crafts, bricklayers and other trades. I mean, it's one thing to say that work rules and terms and maybe wages that are contained in other agreements will bind you if you go into an area. Isn't it a little bit attenuated to say, and oh, by the way, even though you didn't sign on procedurally to an arbitration provision, you've in effect waived your rights to having any other kind of proceeding by virtue of the fact that someone else put that into their contract. Isn't arbitration a little different from what you would anticipate, you say, bound by the terms of another agreement? Well, you don't have to renegotiate everything because they've already done wages and hours and work rules. Well, this particular traveling contractors clause that is at issue in the Local 1 agreement is significantly different than in the sheet metal, which I've shown you two decisions in the Eighth and Ninth Circuit. And also, this circuit in DuBarn back in the 60s had to look at the sheet metal clause, as I pointed out to you. This particular clause, though, says, and I quote, the employer agrees to be bound by the full terms and conditions of the standard agreement. That's the traveling contractors clause. Where are you reading from? I'm reading from the collective bargaining agreement. Well, this says bound by the area-wide negotiated contracts, doesn't it? No, it goes on. It says the traveling contractors clause says when the employer has any work of the type covered by this agreement to be performed outside, therefore, Local 5, covered by this agreement within the area covered by a standard, it goes on to say, then the employer agrees to abide by the full terms and conditions of that standard agreement. Full terms and conditions. So you're saying, but BANDA didn't sign that. It signed something else that said it would be bound by the agreement, so then... What I'm saying is that by signing the Local 1 agreement, they also further said that if we go anywhere else in the country where there's a standard agreement and where that agreement's in place, we agree to be bound not as, and if you really parse out McHistory and also the Atlas Air case, the Eighth Circuit case, the sheet metal, they don't even have as strong a language by saying the full terms and conditions. They talk about what Your Honor just said, basically wages and hours. But what it says here is employer shall abide by the full terms and conditions of the standard agreement in effect on the job site area with respect to all employees wherever hired who perform such work. Exactly. So what we have here is... Isn't that work rules, terms, conditions, hours? Full terms and conditions of the agreement. What else could it mean other than... With respect to all employees. Well, but with respect, a collective bargaining agreement is bargained with respect to employees covered by that collective bargaining agreement. And what it's saying here is the employer agrees to be the full terms and conditions of the agreement are a very, very broad arbitration provision. The Traveler's Contracts Clause is a fairly standard clause in the construction industry? Absolutely. As you'll see in the cases I've cited. I assume it's very common in the Philadelphia area? It's common throughout the country. As I said, in the Local Five Agreement, which is based out of Harrisburg, Pennsylvania, they have a Traveling Contractors Clause that if somebody would sign an agreement there, go to Philadelphia, and in effect not sign the Philadelphia agreement, that clause in the Harrisburg Agreement says you will be bound by the Local One Agreement. With respect to the employees wherever hired. And what does with respect to the employees mean? How do you enforce their rights then, Your Honor? You've enforced their rights by your agreement under the full terms. Is there any case that is on all fours with this with respect to the enforcement of? Oh, absolutely. The McHistory cases and the... Well, there the procedure that was enforced was signed by the employer. No, it was not, Your Honor. In McHistory, you had a Washington State employer who had signed the local agreement in Washington State. Goes to Portland, Oregon, and does work. The Portland, Oregon local there enforced the agreement. You also had... It was according to the procedures in the CBA signed by the employer. But then the court went on to say, if you read carefully McHistory, the court went on to say whether they went under that agreement or the Local 16, if I recall was the case, Local 16. You have Atlas Air and the Eighth Circuit there. They solely went on in the Eighth Circuit in Atlas Air under the local terms of the arbitration provision. You also have this circuit's decision in the 60s in DuBorn. There you have an employer that comes into Philadelphia, out-of-state employer, never signs the Philadelphia agreement. There is a dispute over is that employer bound by the terms of the local agreement? That didn't arise in the context of an arbitration. That arose in the context of the employer going in under Section 301, which is what we're under here, to enforce a contract. That's a cause of action here. To have a strike, a threatened strike, enjoined. The facts of that case are, at oral argument, the union, Local 19 here in Philadelphia, asserted and we have no agreement. We have no agreement at all. They never signed our agreement. This Court, looking at the sheet metal agreement, said, well, of course you do. You don't need a contract for labor law purposes. You don't need a signed agreement. No, I don't think we're disputing that. We don't need anything. We recognize that that. And also, and if I can quote from the Court, they talk about, in DuBarn, that indeed the Court below found that the DuBarn Local 75 collective bargaining agreement is inextricably intertwined with the Local 19 contract. The Court goes on to say, therefore, the parties and their national association, by adopting these provisions, i.e., the traveling contractors provision, must have agreed that they were creating a network for the enforcement of the employer's contractual obligate duties by the local union affected. Local union affected, okay, which in this case is where they were. Otherwise, it would be difficult to explain what those provisions were supposed to mean. That is, if no contract exists in the issue, which really what you have to argue here, there's no contract to arbitrate. Well, I don't think that's the issue. I think they're arguing that the provision doesn't mean that the terms of arbitration Well, then to have that finding, which the lower court did for this court to do that, then you have to explain away the very terms of the traveling contractors clause, which says the employer agrees to abide by the full terms and conditions which contain the arbitration provision. Even before that, if I understand Mr. Davis's argument, it is essentially that this evergreen clause is ambiguous and you shouldn't be bound by it because of the ambiguity. Well, that's his first argument. That's correct. Well, and I gather it's his primary argument. Well, then he also then, that's his first argument. But let me ask you why he's not right inasmuch as this evergreen clause does reference two separate agreements, area-wide negotiated contracts, and then the last sentence, newly negotiated contract. Maybe you can comment on whether that is or is not ambiguous. I don't think it's ambiguous. I think that it's clear that they agreed to be bound by the next area-wide agreement. And the term of that agreement that they're agreeing to would be the terms set forth. Is that the agreement that was amended? The area-wide. The 2004 that brought in the traveling clause? Well, there were two subsequent, Your Honor. The initial one that they signed on to in 1997, that had a term, both of those agreements had a term through 1998. In 1998, there were two subsequent agreements negotiated by the association. And then when that agreement expired, those two agreements were combined into one, and that's the one where you find the traveling contractors clause inserted. Is there a practice? It may not be part of the record, but is there a practice to give the parties or those affected by these negotiated contracts a copy of the contracts? That I can't tell you. You also have in the record, in the arbitration award, and this is on the appendix, page 66, that subsequent, the arbitrator found that it really was not relevant to her looking into the facts, but factually, Banta was complying with the terms of the subsequent agreements, wages and benefits, et cetera, in the subsequent contracts. That's in the arbitration award. We argued. Is that for employers that were working in a different? No, they were in Philadelphia working at times following 1997. If you look at footnote 2 of her decision, Joan Parker's decision, Banta came back in the area at different times following 1997, and if they were right in their interpretation, they would have paid not the new wage rates, not the new benefit rates. They would have paid all of them. That's the extension of their argument, that not only don't I buy into the traveling contractors clause, but I don't buy into wages and benefits. But if you take a look, I mean, that's part of the record. It is that they complied with the, you know, those subsequent agreements in the financial aspects too. So they're being disingenuous by saying, well, we weren't involved by the traveling contractors, but yet they were abiding by the other provisions of the agreement. And as far as the record, as far as refuting that, there was a default enter in this case, so factual facts are undisputed. The only thing at issue here are the legal arguments, which is basically what we have before the court. We have arbitrability issue on the Me Too, Evergreen, and arbitrability issue before the court on the traveling contractors. And in sum, we believe they're bound by the area-wide agreement by virtue of the language, the Me Too language, and the traveling contractors language is incredibly clear and unambiguous that that clause says they must abide by the full terms and conditions. You would have the last phrase of the relevant language. It says, and extending this agreement for the life. You would have it be read to say, and extending the term of this agreement for the life. I think that's the party's intention there. As compared to an extending the terms of this agreement. I believe that's the intention of the parties there. If you focus solely on that phrase and ignore it, you have to ignore the first one then. The two have the and there. You have to give it some logical interpretation. Thank you. All right. Thank you. Mr. Davies, rebuttal. Thank you. There's only really one point I want to respond to. Judge Rendell, you had asked Mr. Johnston if there were any cases squarely on point with this case. And I believe his answer was yes. I disagree with that answer. There are several, many cases dealing with the traveling contractors clause, but all of those that I read involved the situation where the contractor against whom the traveling contractors clause was being asserted had actually signed the contract that contained that clause, unlike here where the only signatures on a contract are seven years before the traveling contractors clause was inserted into the 2004-2009 Local 1 contract. I'm going to make an argument for you and ask you whether this works. You know, there is record evidence that you complied with the wages and, you know, generally were paying what you should have been paying under an agreement that now you say isn't binding on you. Do you believe that it is the provisions having to do with the employees that bind you versus other provisions having to do with the grievance procedures as such? Have you made that argument? Would you make that statement? I have not previously made that argument, Your Honor. Certainly, it is the wages and benefits that are most important to the parties and certainly to the employees. What I would also say, however, is, and I don't have a site handy, in the record, I believe it was in Mr. Johnston's motion for summary judgment, he acknowledged that the record as far as Banta's compliance with the Local 1 contract terms was spotty, that in some cases they paid into the Local 1 benefit funds, in other cases they paid into the Local 5 benefit funds. That's not conclusive. Correct. All right. Thank you. Thank you very much. Thank you, counsel. Case was well argued. Take it under advisement.